783 F.2d 206
 251 U.S.App.D.C. 208
 OFFICE OF CONSUMERS' COUNSEL, STATE OF OHIO, Petitioner
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent
Public Service Commission of the State of New York, Public
Service Commission of West Virginia, Process Gas Consumers
Group, Columbia Gas Distribution Companies, UGI Corporation,
Dayton Power and Light Company, Columbia Gas Transmission
Corporation, Pennsylvania Gas and Water Company, Consumer
Advocate For the Commonwealth of Pennsylvania, Washington
Gas Light Company, Interstate Natural Gas Association of
America, Cities of Charlottesville and Richmond, Virginia,
Consumer Advocate Division of the Public Service Commission
of West Virginia, Cincinnati Gas & Electric Company, et al.,
Baltimore Gas and Electric Company, Public Utilities
Commission of Ohio, Texas Eastern Transmission Corporation,
Transwestern Pipeline Company, Exxon Corporation, Maryland
Office of People's Counsel, Intervenors.
ASSOCIATED GAS DISTRIBUTORS, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Public Service Commission of the State of New York, Public
Service Commission of West Virginia, Pennsylvania Gas and
Water Company, Process Gas Consumers Group, Columbia Gas
Distribution Companies, UGI Corporation, Dayton Power and
Light Company, Columbia Gas Transmission Corporation,
Washington Gas Light Company, Interstate Gas Association of
America, Cities of Charlottesville and Richmond, Virginia,
Consumer Advocate Division of the Public Service Commission
of West Virginia, Office of Consumers' Counsel, Cincinnati
Gas & Electric Company, et al., Baltimore Gas and Electric
Company, Public Utilities Commission of Ohio, Texas Eastern
Transmission Corporation, Transwestern Pipeline Company,
Exxon Corporation, Maryland Office of People's Counsel, Intervenors.
PUBLIC SERVICE COMMISSION of the STATE of NEW YORK, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Washington Gas Light Company, Baltimore Gas and Electric
Company, Exxon Corporation, Maryland Office of People's
Counsel, Cities of Charlottesville and Richmond, Virginia,
Cincinnati Gas & Electric Company, Office of Consumers'
Counsel, Process Gas Consumers Group, Consumer Advocate
Division of the Public Service Commission of West Virginia,
Public Utilities Commission of Ohio, Intervenors.
CITIES OF CHARLOTTESVILLE AND RICHMOND, VIRGINIA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Dayton Power and Light Company, Cincinnati Gas & Electric
Company, et al., Maryland Office of People's Counsel,
Baltimore Gas and Electric Company, Process Gas Consumers
Group, Washington Gas Light Company, Public Utilities
Commission of Ohio, Intervenors.
CITIZEN/LABOR ENERGY COALITION, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Dayton Power and Light Company, Cincinnati Gas & Electric
Company, et al., Baltimore Gas and Electric Company,
Maryland Office of People's Counsel, Consumers' Counsel,
State of Ohio, Process Gas Consumers Group, Washington Gas
Light Company, Public Utilities Commission of Ohio, Intervenors.
BALTIMORE GAS & ELECTRIC COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Dayton Power and Light Company, Cincinnati Gas & Electric
Company, et al., Office of Consumers' Counsel, Maryland
Office of People's Counsel, Process Gas Consumers Group,
Washington Gas Light Company, Cities of Charlottesville and
Richmond, Virginia, Public Utilities Commission of Ohio,
Intervenors.
PROCESS GAS CONSUMERS GROUP, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Public Utilities Commission of Ohio, Office of Consumers'
Counsel, Baltimore Gas and Electric Company, Cities of
Charlottesville and Richmond, Virginia, Washington Gas Light
Company, Maryland Office of People's Counsel, Pennsylvania
Department of Commerce, Association of Businesses Advocating
Tariff Equity, American Iron and Steel Institute, Georgia
Industrial Group, Intervenors.
COLUMBIA GAS TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
UGI Corporation, Dayton Power and Light Company, Public
Service Commission of West Virginia, Process Gas Consumers
Group, Public Service Commission of the State of New York,
Pennsylvania Gas and Water Company, Columbia Gas
Distribution Companies, Ohio Office of Consumers' Counsel,
Washington Gas Light Company, Associated Gas Distributors,
Baltimore Gas and Electric Company, Cities of
Charlottesville and Richmond, Virginia, Interstate Natural
Gas Association of America, Transwestern Pipeline Company,
Texas Eastern Transmission Corporation, Maryland Office of
People's Counsel, The Cincinnati Gas & Electric Company and
Union Light, Heat & Power Company, Consumer Advocate
Division of the Public Service Commission of West Virginia,
Public Utilities Commission of Ohio, Intervenors.
 Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146,
84-1179 and 84-1444.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 23, 1985.
Decided Feb. 4, 1986.
 
 Jennifer N. Waters, with whom Frederick Moring and Roger B. Cooper were on brief for petitioner, Associated Gas Distributors in No. 84-1100 and intervenor in Nos. 84-1099, 84-1135, 84-1142, 84-1143, 84-1146, 84-1179 and 84-1444; and with whom Hodges B. Childs was on brief for petitioner, Baltimore Gas and Electric Company in No. 84-1146 and intervenor in Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1179 and 84-1444.
 William H. Penniman, with whom Edward J. Grenier, Jr. and Glen S. Howard were on brief for petitioner, Process Gas Consumers Group, et al. in No. 84-1179 and intervenors in Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146 and 84-1444. JoAnne Morris also entered an appearance for Process Gas Consumers Group.
 Stephen J. Small, with whom William I. Harkaway, R. Clyde Hargrove and Giles D.H. Snyder were on brief for petitioner, Columbia Gas Transmission Corp. in No. 84-1444 and intervenor in Nos. 84-1099 and 84-1100.
 Joel M. Cockrell, Atty. F.E.R.C., for respondent. William H. Satterfield, Gen. Counsel, Jerome M. Feit, Sol., and Michael E. Small, Atty., F.E.R.C. were on brief for respondent in Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146, 84-1179 and 84-1444. Thomas F. Hirsch, III, Atty. F.E.R.C. also entered an appearance for F.E.R.C.
 Margaret Ann Samuels was on brief for petitioner, Office of Consumer's Counsel, State of Ohio in No. 84-1099 and intervenor in Nos. 84-1100, 84-1135, 84-1146, 84-1179 and 84-1444.
 David E. Blabey, Richard A. Solomon and Robert W. Kneisley were on brief for petitioner, Public Service Com'n of State of New York in No. 84-1135 and intervenor in Nos. 84-1099, 84-1100 and 84-1444.
 Stanley W. Balis and Susan N. Kelly were on brief for petitioners, Cities of Charlottesville and Richmond, Va., et al. in Nos. 84-1142 and 84-1143 and intervenors in Nos. 84-1099, 84-1100, 84-1135, 84-1146, 84-1179 and 84-1444.
 J. Evans Attwell, James W. McCartney, Judith M. Johnson, Kathleen C. Lake, Bolivar C. Andrews and Cheryl M. Foley were on brief for intervenors, Texas Eastern Transmission Corp., et al. in Nos. 84-1099, 84-1100 and 84-1444. David T. Andril also entered an appearance for intervenors, Texas Eastern Transmission Corp., et al.
 John H. Cheatham, III and Edward B. Myers were on brief for intervenor, Interstate Natural Gas Ass'n in Nos. 84-1099, 84-1100 and 84-1444.
 John K. Keane, Jr. and Thomas C. Gorak were on brief for intervenor, Maryland People's Counsel in Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146, 84-1179 and 84-1444.
 Robert P. Haynes, III was on brief for intervenor, Consumer Advocate for the Com. of Pennsylvania in No. 84-1099.
 Frank P. Saponaro, Jr. and Jennifer K. Walter were on brief for intervenor, UGI Corp. in Nos. 84-1099, 84-1100 and 84-1444.
 Donald J. MacIver, Jr., Richard Owen Baish, Scott D. Fobes, C. Frank Reifsnyder and Richard C. Green were on brief for amicus curiae, El Paso Natural Gas Co. in Nos. 80-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146, 84-1179 and 84-1444, urging reversal.
 Richard M. Merriman and Stephen G. Kozey entered appearances for intervenor, Dayton Power and Light Co. in Nos. 84-1099, 84-1100, 84-1142, 84-1143, 84-1146 and 84-1444.
 Glenn W. Letham and Channing D. Strother, Jr. entered appearances for intervenor, Pennsylvania Gas and Water Co. in Nos. 84-1099, 84-1100 and 84-1444.
 Robert R. Rodecker and Denise C. Goulet entered appearances for intervenor, Public Service Com'n of West Virginia in Nos. 84-1099, 84-1100, 84-1135 and 84-1444.
 Lewis Carroll entered an appearance for intervenor, Washington Gas and Light Co. in Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146, 84-1179 and 84-1444.
 Edmund Travis, Jr., Sherman S. Pland and John P. Gregg entered appearances for intervenor, Exxon Corp., in Nos. 84-1099, 84-1100 and 84-1135.
 James J. Mayer entered an appearance for intervenor, Cincinnati Gas & Elec. Co., et al. in Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146 and 84-1444.
 Martin J. Marz and Robert S. Tongren entered appearances for intervenor, Public Utilities Com'n of Ohio in Nos. 84-1099, 84-1100, 84-1135, 84-1142, 84-1143, 84-1146, 84-1179 and 84-1444.
 Before WALD, MIKVA and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case involves several petitions for review of the Federal Energy Regulatory Commission's ("FERC" or "Commission") interpretation of subsection 601(c)(2) of the Natural Gas Policy Act of 1978 ("NGPA"), which guarantees that interstate pipelines can pass through the cost of purchasing natural gas to their customers "except to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." 15 U.S.C. Sec. 3431(c)(2) (1982). At issue here is FERC's definition of the term "abuse" and its application of that definition to the natural gas acquisition and cutback practices of Columbia Gas Transmission Corporation ("Columbia" or "the pipeline").
 
 
 2
 In 1981, Columbia filed two requests for "purchased gas adjustments" ("PGA"), seeking to recover increases of more than $625 million in its costs of purchasing natural gas by increasing the rates charged its customers. Several parties filed protests, alleging that Columbia's practices were abusive, and that passthrough of the costs should be denied. Following a hearing and initial decision by an Administrative Law Judge ("ALJ"), the Commission issued an opinion articulating a two-part test for abuse, which it defined as present in "circumstances where a pipeline's gas acquisition policies and practices evidence a reckless disregard of the pipeline's fundamental duty to provide services at the lowest reasonable cost and such policies have significant, adverse consequences." Columbia Gas Transmission Corp., 26 F.E.R.C. p 61,034, at 61,100 (Jan. 16, 1984) (emphasis added) [hereinafter Opinion No. 204].
 
 
 3
 Although the Commission found that Columbia's failure to consider the marketability of the gas it purchased evidenced "reckless disregard," it held that none of Columbia's practices rose to the level of abuse because the second prong of the test was not satisfied: there were no adverse effects on customers or consumers. However, the Commission did find that Columbia's failure to consider marketability in making purchases was imprudent, and hence a violation of section 5 of the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. Sec. 717d (1982). The Commission also concluded that the high take-or-pay provisions in the pipeline's contracts with gas producers, while not imprudent when entered into, had become a section 5 violation. As remedies for these violations, FERC urged the pipeline to mitigate the consequences of its take-or-pay clauses and adopted a settlement entered into by Columbia in an unrelated rate proceeding under section 4 of the NGA, 15 U.S.C. Sec. 717c (1982).
 
 
 4
 The petitioners fall into two groups. Columbia and several intervenors[1] contend that the Commission's interpretation of abuse is too expansive, challenge the Commission's conclusions that Columbia's practices constituted reckless disregard and imprudence, and object to the remedies imposed by FERC. On the opposing side, petitioners representing customers and consumers[2] protest that FERC's standard for abuse is too high. In addition, they allege that even if the standard is correctly formulated, the Commission has misapplied it in this case. They dispute the Commission's conclusion that Columbia's practices were not abusive and object that the remedies for imprudent behavior are insufficient.
 
 
 5
 We can find no basis to overturn the first prong of the Commission's test of "abuse" under subsection 601(c)(2). FERC's requirement that a pipeline exhibit a "reckless disregard" of its fundamental duty to provide services at the lowest reasonable cost appears well within the range of reasonable interpretations of the statute. However, the second prong of the Commission's test, which requires "significant, adverse consequences" for a finding of abuse, is plainly at odds with the statute. Under subsection 601(c)(2), the only "consequence" necessary for the Commission to deny passthrough when a pipeline has engaged in abusive practices is that the pipeline must have paid an "amount" that was "excessive due to" those practices. The Commission's test of "significant, adverse consequences" adds a requirement that is impermissible under the statute. We therefore reverse the second portion of the Commission's test and remand for further elaboration of the standard.
 
 
 6
 We find that substantial evidence supports the Commission's determinations that Columbia's treatment of marketability showed reckless disregard of its duty and that the take-or-pay clauses in its contracts were imprudent. However, we remand the marketability issue for reconsideration under subsection 601(c)(2) in light of our holding on the standard for abuse. We also conclude that the Commission failed to consider the evidence as a whole in finding that (1) Columbia's purchases did not contribute to an excess supply of gas and that, (2) other than its take-or-pay clauses, Columbia's contractual terms were neither abusive nor imprudent. Additionally, the Commission impermissibly relied on ex parte evidence to conclude that Columbia's cutback policies did not violate either the NGPA or the NGA. We remand these matters for further consideration. Finally, the remedies imposed by FERC for Columbia's violations of section 5 of the NGA were an abuse of discretion and must be reformulated on remand.
 
 I. BACKGROUND
 A. Regulatory Framework
 
 7
 The Commission regulates the sale and transportation of natural gas in interstate commerce under authority granted in the NGA, 15 U.S.C. Secs. 717-717w (1982), and the NGPA, 15 U.S.C. Secs. 3301-3432 (1982). Pipelines normally purchase gas and resell it to distributors and customers; the rates they charge have been regulated by the Commission and its predecessor, the Federal Power Commission ("FPC"), since 1938. In 1954, the FPC extended its scrutiny of natural gas rates to wellhead prices after the Supreme Court, in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), held that the NGA required the FPC to regulate sales of gas by independent producers to interstate pipelines.
 
 
 8
 Rates subject to regulation pursuant to the NGA are unlawful unless they are "just and reasonable." 15 U.S.C. Sec. 717c(a) (1982). In determining if a pipeline's rates are "just and reasonable" the Commission has traditionally used a "cost-of-service" methodology that allows a pipeline to recover in its rates the expenses of acquiring and transporting gas--if those costs were prudently incurred--plus a reasonable return on investment.[3] Rate setting is governed by section 4 of the NGA, which provides that all changes in rates must be approved by the Commission. 15 U.S.C. Sec. 717c(d) (1982). The Commission may, on its own initiative or following a complaint, hold a hearing to determine the lawfulness of a requested rate change; pipelines and producers bear the burden of proving that the rates they request are just and reasonable. Id. Sec. 717c(e). Section 5 gives the Commission the authority to hold a hearing outside the rate-setting context on rates or on "any rule, regulation, practice, or contract" that affects a rate. It also grants the Commission remedial authority to decrease rates it finds not just and reasonable or to determine and order a just and reasonable rule, regulation, practice or contract. 15 U.S.C. Sec. 717d(a) (1982).
 
 
 9
 In 1972, because of a backlog in section 4 rate filings, the FPC established an optional alternative to lengthy full-scale section 4 review to adjust pipelines' rates for changes in the cost of purchasing gas.[4] Interstate pipelines with Commission-approved provisions in their tariffs may submit a special "purchased gas adjustment" filing biannually to adjust their rates for increases or decreases in the cost of gas they purchase from suppliers. See 18 C.F.R. Sec. 154.38(d)(4) (1985). In exchange, the pipelines must agree to submit all costs and revenues to a full-scale section 4 review at least once every three years. Id. Sec. 154.38(d)(4)(vi).
 
 
 10
 In 1978, Congress altered the regulatory scheme for natural gas by enacting the NGPA. In order to provide incentives for increased gas production,[5] Congress partially deregulated the wellhead prices producers could charge for gas. The price of some categories of gas was completely exempted from all federal regulation within the year.[6] Price controls were phased out gradually in other categories: the NGPA eliminated the Commission's ratemaking authority over "first sales" of natural gas immediately,[7] 15 U.S.C. Sec. 3431(a)(1) (1982), and substituted statutorily defined "maximum lawful prices" to act as ceilings during the interim period, id. Secs. 3312-3319.[8]
 
 
 11
 Interstate pipelines, however, unlike producers, remained subject to regulation by the Commission, which, with one major exception, continues to scrutinize each pipeline's costs and to allow recovery in a pipeline's rates only of costs that are "prudently" incurred. In order to coordinate continued regulation of pipelines with deregulation of wellhead prices, Congress created an exception to pipeline regulation for gas acquisition costs, which, on average, account for about 90% of pipeline operating and maintenance costs.[9] Section 601 of the NGPA replaced the "cost-of-service" analysis and provides that any amount paid for a wellhead purchase shall be deemed just and reasonable if the category of gas is deregulated or if the price does not exceed the maximum lawful price established by the NGPA. 15 U.S.C. Sec. 3431(b) (1982). The Commission may not deny recovery of a pipeline's costs for purchasing gas if it meets this statutory definition of just and reasonable "except to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." Id. Sec. 3431(c)(2). The Commission's interpretation of this provision when abuse is alleged is at issue in this case.
 
 B. Proceeding in This Case
 
 12
 Following the passage of the NGPA in 1978, Columbia began purchasing deregulated section 107 gas supplies,[10] some at prices in excess of $8.00/Mcf (thousand cubic feet). Opinion No. 204, 26 F.E.R.C. at 61,097. In contrast, its average cost of gas from all its sources[11] during the period from September 1981 to February 1982 was $2.93/Mcf. Columbia Gas Transmission Corp., 22 F.E.R.C. p 63,093, at 65,361 n. 16 (Dec. 30, 1982). The increased costs, principally for the 107 gas, were reflected in the two PGA filings Columbia made in 1981. The first, filed January 29, 1981, increased rates effective March 1, 1981 to reflect an increase of $99,420,570 in the cost of gas for the following six months, plus a surcharge of $18,889,143.[12] The second filing increased rates effective September 1, 1981 to compensate for increased gas costs of $381,896,469, plus a surcharge of $124,890,831 for Columbia's deferred balance.[13] In both proceedings, several parties protested the filings, alleging that Columbia's section 107 purchases were abusive. FERC made the filings effective subject to a refund, consolidated the proceedings and ordered a hearing before an ALJ on the lawfulness of the rates proposed by Columbia pursuant to its authority under section 601 of the NGPA and sections 4, 5, 7, 8 and 15 of the NGA. This was the first docket involving allegations of abuse to be set for a hearing.
 
 
 13
 Following a hearing in February and March 1982, the ALJ issued his initial decision on December 30. Columbia Gas Transmission Corp., 22 F.E.R.C. p 63,093 (Dec. 30, 1982) [hereinafter Initial Decision ]. Prior to the hearings, the Commission had issued several statements on its interpretation of "fraud, abuse, or similar grounds." The initial order setting a hearing stressed that abuse "does not refer to imprudence but to serious improprieties." 14 F.E.R.C. at 61,380. In April 1981, the Commission issued an order reaffirming that "mere imprudence as determined under the NGA does not of itself constitute an abuse under Section 601(c) of the NGPA." Columbia Gas Transmission Corp., Order Clarifying Prior Orders and Denying Request for Oral Argument, 15 F.E.R.C. p 61,104, at 61,227 (Apr. 30, 1981) [hereinafter Clarifying Order ]. Further enunciation of the abuse standard was deferred until the hearing, where factual and legal matters could be more fully developed. In February 1982, FERC issued a nonbinding statement of policy that defined the elements of subsection 601(c) by reference to tort law. In this policy statement, FERC equated "abuse" with "negligent misrepresentation or concealment, or other misrepresentation or concealment in disregard of duty," and defined "fraud" as "fraudulent misrepresentation or concealment," and "other similar grounds" as "innocent misrepresentation of fact." 18 C.F.R. Sec. 2.300 (1985).
 
 
 14
 In his decision, the ALJ adhered to the Commission's view that abuse is not the equivalent of imprudence, stating that Congress intended "to deprive the Commission of authority to deny passthrough of gas costs that were 'imprudently' incurred." Initial Decision, 22 F.E.R.C. at 65,332. However, he found that the definition of abuse in the Commission's policy statement was too narrow because, while abuse was intended as something other than fraud, the Commission defined it as misrepresentation, which is an element of fraud. The ALJ concluded that abuse may encompass inappropriate activities, in addition to misrepresentation, that "surpass" imprudence. Id. at 65,333.
 
 
 15
 The ALJ found that the pipeline sought to pass through to customers the high cost of deregulated gas while cutting back its purchases of low-priced regulated supplies. He concluded that these cutback practices were abusive under subsection 601(c)(2) because they represented serious violations of Columbia's fundamental obligations. Consequently, he denied passthrough of the excessive costs that Columbia incurred because of these practices. Id. at 65,346.
 
 
 16
 Although the ALJ found that none of the other conduct challenged by the protestors was egregious enough to constitute "abuse" under the NGPA, he did conclude that there were several NGA violations. First, according to the ALJ, Columbia failed to consider the effect of its increasing purchase costs, normally subject to passthrough and reflected in its rates, on the future marketability of its gas. It also structured its purchases as if the primary alternative fuel to which its markets were vulnerable was No. 2 fuel oil, while, in fact, industrial firms typically turn to lower-priced No. 6 fuel oil as their alternative fuel.[14] The ALJ also found that more than one-third of Columbia's market was industrial, and hence susceptible to fuel-switching as the price of gas approached the "market-clearing" price.[15] In the ALJ's view, Columbia's practices were imprudent. In addition, he noted that the consequences of these practices fall most heavily on customers without the capacity to switch to fuel oil as purchased gas costs increase and fixed costs are spread over a smaller sales volume. Id. at 65,356.
 
 
 17
 Second, the ALJ found that Columbia used its affiliate producer, Columbia Gas Development Corporation ("CGD"),[16] as an agent to negotiate its contracts with other Southwestern gas producers. CGD then entered into contracts with Columbia containing the same terms and conditions as did the contracts CGD had previously negotiated for the pipeline with unaffiliated producers. The ALJ found that this dual role of agent and supplier, coupled with the method of contracting between the affiliates, produced an inherent conflict of interest. This conflict of interest could contribute to rates above the "lowest reasonable rates," to the detriment of Columbia's customers. Id. at 65,356-57.
 
 
 18
 Third, the ALJ concluded that Columbia purchased large quantities of high-cost section 107 gas in excess of its system supply requirements. The ALJ found that while some surplus is desirable, Columbia's surplus, which was so great that it necessitated extensive cutbacks and off-system sales at below normal rates, far exceeded reasonable levels. Moreover, he rejected Columbia's arguments that a near-term surplus was necessary to ensure future supplies. Id. at 65,358.
 
 
 19
 Finally, the ALJ found that Columbia's contracts for section 107 gas contained unfavorable provisions that greatly reduced the pipeline's flexibility in controlling excess supply and taking a mix of gas that would produce the lowest reasonable rate for its customers. The contracts contained high take-or-pay provisions,[17] favored nation clauses,[18] indefinite escalator provisions[19] and unfavorable "market-out" clauses,[20] which the ALJ found prevented Columbia from fulfilling its NGA obligation to sell gas at the lowest reasonable rate. Id. at 65,358-59. The ALJ found that each of these purchase practices was unjust and unreasonable under section 5 of the NGA and ordered Columbia to desist from these methods. In addition, Columbia's contracts with CGD contained the same types of clauses. The ALJ condemned this practice, finding "no justification whatsoever" for the pipeline to extend these terms to its own affiliate. Id. at 65,359.
 
 
 20
 In January 1984, the Commission issued Opinion No. 204, which affirmed the ALJ's initial decision in part and modified it in part. 26 F.E.R.C. p 61,034 (Jan. 16, 1984). Like the ALJ, the Commission rejected its earlier policy statement definition of "abuse," substituting a new two-part test. The first half of FERC's new interpretation requires that a pipeline exhibit reckless disregard of its "fundamental duty to provide service at the lowest, reasonable rate consistent with maintenance of adequate service," before the Commission will find abuse. Id. at 61,100. Action is taken in reckless disregard if it disregards a risk so serious as to make it "highly probable" that an adverse effect would follow the action. The Commission further defined the term as "an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care or imprudence, but [not requiring] a showing of intent to cause harm." Id. In the second half of its test, the Commission concluded that in order to constitute an abuse, a pipeline's practices must have a "significant, adverse effect on customers (such as a significant loss of market) or consumers." Id.
 
 
 21
 In applying this interpretation, the Commission held that Columbia's failure to consider the marketability of the gas it was purchasing satisfied the first, but not the second prong of its test for abuse. The Commission found that Columbia had virtually ignored the effect of competition from alternative fuels by acquiring gas without regard to the effect of its price on Columbia's markets and by choosing No. 2 rather than No. 6 fuel oil as the relevant competitive fuel. It concluded that these gas acquisition practices evidenced reckless disregard of Columbia's duty to provide service at the lowest reasonable rate. Id. at 61,101-02. However, the Commission found no evidence that Columbia's customers had suffered a significant loss of market, and hence concluded that the marketability policies had no adverse effect and did not satisfy the second part of the test for "abuse." Id. at 61,102-03.
 
 
 22
 On the question of Columbia's cutbacks of its takes of gas from its suppliers, the Commission disagreed with the ALJ and reversed his holding that Columbia's cutback policies were abusive. It held that improper cutbacks may be a basis for denying passthroughs under subsection 601(c)(2), but found that the record did not support a finding of abuse in Columbia's case.[21]
 
 
 23
 The Commission also evaluated Columbia's conduct for violations of section 5 of the NGA. While FERC did not view Columbia's failure to consider the effect of its purchases on the marketability of its gas as reaching the level of abuse, the Commission did find that this conduct was imprudent. As a remedy, it accepted a proposed settlement of a completely separate section 4 rate proceeding, which increased rates for the period of January 1983 through April 1984.[22] The rates in the settlement were calculated using a higher sales volume than Columbia was actually achieving, so the Commission reasoned that it would provide Columbia with an incentive to consider marketability in order to increase sales and avoid risk to its equity.[23]
 
 
 24
 The Commission agreed with the ALJ's holding that Columbia's use of its affiliated producer as a negotiating agent was imprudent. While it concluded that it could find no evidence that CGD had manipulated the relationship for its benefit or to the detriment of Columbia's customers, it recognized that the interests of the two companies in the negotiated contracts were "inherently inconsistent." Id. at 61,116. Columbia was ordered to phase out the relationship with CGD within a year. Id.
 
 
 25
 The Commission rejected the ALJ's conclusion that Columbia had violated the NGA by making excessive gas purchases that created a surplus. It voiced concern "over Columbia's failure to consider the price assumptions underlying their customers' sales estimates and to link volume and price in its own projections," but concluded that there was insufficient evidence to show that these shortcomings had caused the pipeline's surplus. FERC attributed the surplus in major part to the effects of the recession, which reduced demand for gas and increased supplies from Columbia's pipeline suppliers whose demand was likewise decreased. Id. at 61,117.
 
 
 26
 The Commission also rejected the ALJ's decision that Columbia was imprudent to agree to restrictive provisions in its contracts for section 107 gas. Yet, while it found that none of the terms were imprudent when entered into, the Commission concluded that the pipeline's current difficulties were caused in large part by the operation of the take-or-pay clauses in the section 107 contracts. It labeled the effect of the take-or-pay clauses as "unjust, unreasonable, unduly discriminatory and preferential," and directed Columbia to "take all reasonable action to mitigate" the consequences of the clauses. Id. at 61,120.
 
 
 27
 Finally, based on its analysis that Columbia's cutback policies were not abusive, the Commission concluded that they were not unreasonable and hence found no violation of NGA section 5. Id. at 61,111.
 
 
 28
 Parties on both sides requested a rehearing on Opinion No. 204. On March 16, 1984, FERC issued Opinion No. 204-A, which largely affirmed No. 204. Columbia Gas Transmission Corp., 26 F.E.R.C. p 61,334 (Mar. 16, 1984) [hereinafter Opinion No. 204-A ].[24] Commissioner Hughes issued a separate statement dissenting in part and concurring in part. 27 F.E.R.C. p 61,475 (June 22, 1984).
 
 II. STATUTORY INTERPRETATION
 
 29
 In reviewing FERC's construction of "abuse" in section 601 of the NGPA, our first inquiry is "whether Congress has directly spoken to the precise question at issue." Chervon, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). When Congress has so spoken, both courts and agencies must "give effect to [its] unambiguously expressed intent." Id., 104 S.Ct. at 2781-82. Thus, "reviewing courts ... must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' " Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).
 
 
 30
 If, however, Congress has not spoken clearly on the precise question at issue, the reviewing court must inquire further and determine if the agency's interpretation of the statute "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." Chevron, 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). In pursuing this inquiry, we must accord the "view of the agency charged with administering the statute ... considerable deference." Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc., --- U.S. ----, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985). While the agency's position must be "based on a permissible construction of the statute," Chevron, 104 S.Ct. at 2782, it need not be the one we might find most persuasive. The agency's construction is adequate if it falls within the permissible range of interpretations and we must "not simply impose [our] own construction on the statute." Id.
 
 
 31
 Under these standards, we conclude that the Commission's requirement that a pipeline must exhibit "reckless disregard of its duty" in order for its challenged practices to constitute abuse is a reasonable interpretation of subsection 601(c)(2) of the NGPA. These same standards, however, dictate our conclusion that the second prong of FERC's interpretation of abuse, that the practice must have a significant adverse effect on the pipeline's customers or consumers, is an impermissible requirement that conflicts with the plain meaning of the statute.
 
 A. Reckless Disregard of Duty
 
 32
 Columbia objects to the Commission's "expanded" interpretation of abuse and argues that the Commission should adhere to the policy statement definition it set forth prior to the hearings in this case. On the other side, the protestors present various arguments that the standard is too strict, making it too difficult for the Commission to deny passthrough. Several argue that "reckless disregard" is inconsistent with the plain meaning of "abuse," which Black's Law Dictionary (5th ed. 1979) defines, inter alia, as "immoderate or improper use" or "contrary to good order established by usage." Nowhere, they claim, is there the requirement of a heightened level of culpability introduced by the term "reckless." The protestors also claim that FERC's formulation ignores definitions of abuse in its own precedents and in other statutes, and that the "reckless disregard" test is inconsistent with FERC's statutory obligation to protect consumers because the Commission's definition would allow passthrough of gas costs incurred negligently or even with gross negligence. Finally, some protestors take the position that "abuse" implies nothing more than "imprudent," the standard applied to all pipeline costs under sections 4 and 5 of the NGA, prior to passage of the NGPA.[25]
 
 
 33
 We start our review with the language of the statute itself. See, e.g., Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Section 601 of the NGPA is entitled "Coordination with the Natural Gas Act" and subsection (c) provides, as a general rule, for guaranteed passthrough of pipelines' costs of acquiring gas as long as they are just and reasonable. Under the terms of subsection (b), prices are just and reasonable if they are paid for deregulated gas or are within the maximum lawful prices designated for regulated gas. The only qualification limiting this guarantee that gas costs may be recovered in rates is the exception at issue here: passthrough may be denied for amounts paid that were "excessive due to fraud, abuse, or similar grounds."[26]
 
 
 34
 We reject Columbia's argument that "abuse" must be defined in the terms used in FERC's preliminary policy statement for the same reason that the Commission subsequently rejected this position: the policy statement requirement of misrepresentation is impermissible under the plain language of the statute. In the Commission's words, "[t]he difficulty with the policy statement definition is that, by confining fraud, abuse, or similar grounds to variations of misrepresentation, the policy statement effectively reads 'abuse' out of the statute." Opinion No. 204-A, 26 F.E.R.C. at 61,710. In short, if Congress had specified "fraud or similar grounds," that phrase would cover the same spectrum of activities as would the interpretation of the complete phrase urged by Columbia. To the extent possible, subsection 601(c)(2) should be interpreted so as to give meaning to all of its terms,[27] and normally words connected by a disjunctive are given separate meanings. See Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979).
 
 
 35
 We must likewise reject the position of those parties who contend that the Commission should equate "abuse" under the NGPA with "imprudence" or "unjust and unreasonable" conduct under the NGA. On its face, subsection 610(c)(2) establishes a different standard for denying passthrough of gas costs--the "fraud, abuse, or similar grounds" language at issue here. If mere imprudence were sufficient to trigger the exception to guaranteed passthrough, then FERC's subsection 601(c)(2) inquiry would be identical to the NGA procedure for denying recovery of any cost not found to be "just and reasonable." This interpretation would make subsection 601(c)(2) superfluous because the inquiry thereunder could be conducted pursuant to the NGA.
 
 
 36
 In addition, equating abuse with imprudence would make little sense in light of subsection 601(b), in which Congress eliminated authority for the traditional "just and reasonable" inquiry with regard to gas acquisition costs and defined the cost of deregulated gas or gas priced within the statutory limits as a "just and reasonable" pipeline expense. Passthrough is guaranteed only if the amount paid for gas falls into this special statutory "just and reasonable" range. Having just abrogated the traditional NGA "just and reasonable" standard for gas acquisition costs, Congress could not have intended FERC to deny passthrough of those costs pursuant to that same standard.
 
 
 37
 The sparse legislative history on subsection 601(c)(2) is consistent with the statutory language and supports the conclusion that either an expansion of FERC's definition to include imprudence or a narrowing to limit the definition to cases of misrepresentation would be impermissible. The language at issue was completely lacking in the original versions of both the House and Senate bills. The first reference to fraud and abuse appeared in a June 15, 1978 staff report for the conference committee on the NGPA. The staff report stresses that the purpose of the section is to "[a]ssure that there is no indirect or 'back door' producer regulation by FERC" and, in addition, states that the conferees "agreed to include language in the joint statement of managers that makes clear there is no intention to override the inherent enforcement power of FERC to police fraud, abuse, etc."[28] The language creating the exception to guaranteed passthrough was added to the NGPA two months later in the conference draft of August 16, 1978.[29] The protestors argue that the June staff report does not indicate congressional intent because it was written before the language was added to the statute. Yet it does reflect a congressional concern with regulation of wellhead prices which is consistent with FERC's interpretation of the statute. Moreover, even if the staff report does not clearly validate the Commission's reading of "abuse," no party has been able to point to anything in the legislative history that repudiates, or is even remotely inconsistent with, the Commission's position.
 
 
 38
 The Commission is correct in concluding that the statutory language plainly indicates that a reading of "abuse" as either misrepresentation or imprudence would be inconsistent with congressional intent. But between these two impermissible extremes we cannot say that Congress has "unambiguouslyexpressed [its] intent" on the interpretation of "abuse." See Chevron, 104 S.Ct. at 2781-82. Neither subsection 601(c)(2) nor the minimal legislative history dictate a single meaning for "abuse." Hence, under Chevron, our inquiry is limited to a determination of whether "reckless disregard" falls within the permissible range of accommodations of the various policies embodied in the NGPA. We conclude that it does.
 
 
 39
 We agree with the protestors that there are quibbles with the Commission's choice of "reckless disregard" and we doubt that, were we interpreting the term in the first instance, we would resort to the language of tort law to define "abuse." But, in spite of these quibbles, however legitimate, we cannot say that the Commission's definition is inconsistent with congressional intent. The argument that FERC should have chosen a dictionary definition is unavailing; the protestors themselves cite a multitude of acceptable meanings for "abuse,"[30] and there is nothing to make any particular one compelling. As stated by the Commission in Opinion No. 3204-A, "[t]he dictionary definitions simply reflect the full range of possible ways of defining the term; they are of no assistance in pinpointing the definition that Congress intended." 26 F.E.R.C. at 61,711 (emphasis in original) (footnote omitted). Similarly, different usage of the term in opinions and statutes in unrelated contexts does not make FERC's choice impermissible.[31]
 
 
 40
 The NGPA requires the Commission to accommodate two competing policies in evaluating allegedly abusive pipeline conduct. Both the statutory mandate to deregulate producer prices and the available legislative history reflect congressional concern with "back door" regulation of producers. The fear was that if it were easy for FERC to deny passthrough of the prices pipelines paid producers, this would provide an avenue for the Commission to regulate indirectly the prices producers charged. It is clear that Congress intended the "fraud, abuse, or similar grounds" standard to provide the Commission with authority to review gas prices paid by pipelines, but that this authority is narrower than the broad review mandated by the NGA and, therefore, avoids indirect regulation. Simultaneously, it is a long-standing principle of pipeline regulation that pipelines must operate efficiently.[32] Recovery of gas acquisition costs is guaranteed by subsection 601(c)(2), but pipelines are still subject to a duty to minimize all costs. As the Commission recognized, the statutory limitation on passthrough must be interpreted in light of this duty. See Opinion No. 204, 26 F.E.R.C. at 61,100. The Commission's selection of "reckless disregard" accommodates both these concerns and falls within the permissible range of statutory interpretations.
 
 B. Significant Adverse Consequences
 
 41
 The second prong of FERC's test limits the denial of passthrough due to abuse to situations in which the pipeline's reckless conduct has a significant adverse effect on customers or consumers. This requirement adds an impact test that is inconsistent with the plain meaning of subsection 601(c)(2), and hence impermissible. Chevron instructs that when an agency's interpretation defies the clear meaning of a statute it cannot be upheld. The Supreme Court has thus made it clear that we "must reject administrative constructions which are contrary to clear congressional intent." Chevron, 104 S.Ct. at 2782 n. 9.
 
 
 42
 The Commission reasons that because Congress intended subsection 601(c)(2) to limit FERC review of the amounts pipelines pay for gas, the statutory exception to passthrough should be construed to apply only in "exceptional circumstances." In short, the Commission concludes that it must
 
 
 43
 reject the theory that a pipeline's reckless conduct, without more, justifies denial of passthrough and reaffirm that for conduct to be abusive, it must have a significant, adverse effect on customers or consumers.
 
 
 44
 Opinion No. 204-A, 26 F.E.R.C. at 61,712.
 
 
 45
 The Commission is quite correct that, under subsection 601(c)(2), reckless conduct, by itself, is not enough to justify a denial of passthrough; an effect is required. What the Commission overlooks is that subsection 601(c)(2) itself clearly dictates what that effect must be. The statute specifies that "the Commission may not deny ... recovery of [gas purchase costs] ... except to the exent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." 15 U.S.C. Sec. 3431(c)(2) (1982). Thus the impact that Congress set forth as a prerequisite for a denial of passthrough is an excessive payment.[33] Requiring abuse to encompass a significant adverse effect--i.e., over and above excessive payments--is flatly inconsistent with Congress' clear message on this precise issue, and therefore impermissible.
 
 
 46
 Arguably, it is possible to read FERC's impact test to equate "excessive payments" with "significant, adverse effect;" that is, to view the two terms as virtually synonomous. At oral argument, FERC's counsel seemed to suggest that the second prong of the Commission's test is merely intended to define "excessive payments."[34] The difficulties with this argument are twofold: first, the Commission itself has never explicitly adopted the position now hesitatingly espoused by counsel; and, second, excessive payments and significant, adverse effects plainly are not coterminous in meaning. Indeed, on this latter point, the Commission's analysis in this case is inconsistent with an interpretation of "significant, adverse effect" as "excessive amount paid." The Commission found that the "significant, adverse effect" prong of its test for abuse was not met because Columbia did not suffer significant market loss as a result of its reckless disregard. The Commission did not look for excessive amounts paid as a requirement for denying passthrough.
 
 
 47
 On its face, "significant, adverse effect" sweeps much more broadly than does a limitation tied to "excessive payments;" therefore, for us to attempt to equate the two terms would be to expand the plain meaning of subsection 601(c)(2). In short, FERC's interpretation fails because any test for the exception to guaranteed passthrough must involve an examination for excessive payments for natural gas. This requirement applies uniformly with respect to all cases of "fraud," "abuse" and "other similar grounds" under subsection 601(c)(2).
 
 
 48
 Another possible construction of the second prong of the Commission's test would follow a three stage analysis: first, a determination as to whether an excessive price was paid; second, an inquiry regarding reckless disregard; and third, a finding with respect to any additional impact on customers or consumers. Although such an interpretation is suggested by FERC's test, it is plainly foreclosed by the statute because it adds a separate, third tier of consideration that is not encompassed within section 601. FERC comes close to acknowledging this in its brief when it states:
 
 
 49
 It is true that, [sic] the statute itself provides for relief where "the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds" [emphasis added]. But, what is at issue here is the meaning of "abuse."
 
 
 50
 Brief for Respondent Federal Energy Regulatory Commission at 35. Such a fragmented view of the statute makes no sense. "Abuse" cannot be construed in complete isolation from the words around it.
 
 
 51
 If "abuse" contains a second and distinct impact requirement, i.e., over and above the excessive amount paid specified in subsection 601(c)(2), then this would have the inevitable effect of increasing the burden on petitioners who request the Commission to deny passthrough.[35] This additional burden is impermissible because it contradicts the express requirements detailed by Congress in subsection 601(c)(2).
 
 
 52
 One possibility remains. At times during oral argument the level of confusion over the meaning of FERC's test was so high that one might easily conclude that the second prong of the Commission test simply defies comprehension. If this is so, we are constrained to remand this case to FERC for further consideration and elaboration of its decision.
 
 
 53
 We fully understand that it is not the role of the reviewing court to dictate the particular test that the Commission should use to deny passthrough. We reverse only the second part of FERC's definition and leave intact the Commission's reading of "abuse" as "reckless disregard" because that interpretation falls within the range of meanings permissible under the statute. Because the Commission has not as yet considered the statutory requirement that the "amount paid [be] excessive," we remand to FERC for further consideration of the standard for denial of passthrough in light of the entire subsection. Given the statutory language and legislative history of the subsection, we think a reasonable reading of excessive payment is the difference between what the pipeline actually paid for the gas and the lower amount it would have paid absent the abusive or fraudulent conduct. However, the task of fleshing out the excessive payment requirement to deal with the practicalities of the marketplace is left to the Commission. FERC's counsel was candid in noting that this was the first case in which this issue arose and in suggesting that the agency struggled with the definition. The changes in the statutory interpretation between the issuance of FERC's policy statement and Opinion No. 204 are evidence of that struggle. While we appreciate both those efforts and the candor of agency representatives, we are nevertheless required to fulfill our responsibility to engage in meaningful judicial review.
 
 III. SCOPE OF SECTION 601 PROCEEDINGS
 
 54
 We agree with the Commission that its considerations under section 601 of the NGPA are not limited to the examination of single transactions and may include an inquiry into the practices and policies of a pipeline company. Such a limitation would exclude from scrutiny much pipeline conduct with the potential to cause passthrough of excessive prices. For instance, a company's decision to purchase a particular mix of gas could be abusive and result in excessive amounts paid, yet FERC could not properly consider the appropriateness of the mix if the agency were limited to an examination of individual purchases.
 
 
 55
 Columbia argues that the Commission's findings pursuant to section 5 of the NGA impermissibly expanded the scope of this proceeding and denied it due process of law because it had no notice that the prudence standard would be applied. Under section 601 of the NGPA, the Commission can consider the same range of practices involved in a section 4 or 5 case under the NGA. The ultimate question is narrower under section 601; there the Commission only considers pipeline practices insofar as they are evidence of "fraud, abuse, or similar grounds" and insofar as there is a nexus between the proscribed behavior and excessive price. However, because a section 5 inquiry generally covers the same range of issues as the considerations under section 601, the Commission did not err in conducting one proceeding and in evaluating the same evidence for violations of both statutes.
 
 
 56
 We note that the orders setting Columbia's PGA filings for a hearing did so pursuant to both the NGA and the NGPA. Moreover, several parties alleged that Columbia's practices were imprudent as well as abusive and Columbia's motion to limit discovery to issues of abuse was denied by the Commission, which noted that issues of imprudence had been raised. See Opinion 204-A, 26 F.E.R.C. at 61,722. In short, there is no doubt that Columbia was on notice that the FERC proceeding encompassed questions of alleged imprudence. Therefore, we find that Columbia's due process claims are wholly without merit.
 
 IV. SUBSTANTIAL EVIDENCE
 
 57
 A. Columbia's Failure to Consider Marketability in its Gas Acquisition Policies
 
 
 58
 Substantial evidence amply supports the Commission's conclusions that Columbia's purchase procedures were imprudent and evidenced reckless disregard for its duty to provide service at the lowest reasonable rate. FERC found that the pipeline largely ignored the effect of competition from alternative fuels in determining how much gas to purchase at the prices demanded by producers. First, Columbia did not consider the possibility that its customers might switch to No. 6 fuel oil, and second, it acquired gas without regard for the effect of the purchase price on its ability to sell the gas in a market with competition from alternative fuels. Opinion No. 204, 26 F.E.R.C. at 61,101-02.
 
 
 59
 Columbia challenges the finding of reckless disregard on two grounds. First, the pipeline claims that by departing from the interpretation of "abuse" in its policy statement and formulating a new standard in Opinion No. 204, the Commission deprived Columbia of due process of law. Second Columbia argues that the record does not support FERC's finding that the pipeline's practices exhibited reckless disregard. Both arguments are unavailing.
 
 
 60
 Columbia had unequivocal notice that the Commission's policy statement was not its last word on the issue of abuse under subsection 601(c). In its Clarifying Order, the Commission definitely rejected Columbia's requests that it define "fraud, abuse, or similar grounds" specifically and then limit discovery based on that definition. While reaffirming its position that imprudence is not by itself enough to constitute abuse, the Commission acknowledged that this did not resolve the question of what does constitute abuse. It stressed that "[t]his remaining question has both legal and factual aspects, which will benefit from development through the hearing process." 15 F.E.R.C. at 61,228. Moreover, the policy statement itself did not purport to do more than "provide general guidance." The Commission stated explicitly that "[t]he provisions of this policy statement do not establish a binding norm.... In particular cases, both the underlying validity of the policy and its application to particular facts may be challenged and are subject to further consideration." 18 C.F.R. Sec. 2.300 (1985). Columbia's claim that the new definition of abuse developed in the instant proceedings deprived it of due process is completely without merit.
 
 
 61
 The pipeline's challenge to the substance of the Commission's finding that it behaved in reckless disregard of its duties is equally unconvincing. The market served by Columbia and its customers is in large part composed of industrial users of natural gas, who can potentially switch to No. 6 fuel oil if the price of gas exceeds that of fuel oil. Columbia's own witness testified that the pipeline had selected No. 2 fuel oil as the relevant alternative fuel rather than lower priced No. 6 fuel oil. He attempted to justify this decision with data showing that 31.6% of the industrial customers of Columbia's affiliated distribution companies were currently equipped to switch to No. 2 fuel oil while 8.5% had facilities to switch to No. 6 fuel oil. See Opinion No. 204, 26 F.E.R.C. at 61,101. The inadequacies of this evidence are manifest in the record. In choosing No. 2 fuel oil, Columbia ignored the markets of its unaffiliated distributors which represent almost half of Columbia's sales. See Initial Decision, 22 F.E.R.C. at 65,354. In addition, the level of current capability to switch immediately to No. 6 fuel oil says nothing about the ability of industrial users to install facilities if the price of natural gas should rise above the cost of No. 6 fuel oil, a factor ignored by Columbia. See Opinion No. 204, 26 F.E.R.C. at 61,101. Moreover, the record also contains ample evidence that the price of No. 6 fuel oil is the appropriate benchmark for competition from alternative fuels[36] and that Columbia's industrial market is no exception.[37] Not only is Columbia's market no exception, but the pipeline's own testimony supports the conclusion that at least 8.5% of its market is vulnerable to fuel switching.
 
 
 62
 As to Columbia's failure to link its purchases with its ability to sell gas in a competitive market, the record indicates that the pipeline determined the amount of gas it needed to acquire by polling its customers. It provided its customers with price projections for general guidance, but did not determine what price assumptions they used as the basis for their demand estimates. Columbia or its affiliate, CGD, then sought to acquire the gas, but did not adjust the amount required based on the eventual purchase price. Opinion No. 204, 26 F.E.R.C. at 61,102. Yet the volume of gas that Columbia and its customers can sell is directly affected by the cost of Columbia's purchases passed through to its customers and ultimately to consumers. This failure to link gas acquisition and marketability results in a high risk that a significant portion of Columbia's gas will become unsaleable and that fuel-switching will reduce the number of customers who must shoulder the burden of the increased gas acquisition costs as well as fixed costs. Under these circumstances, the Commission's findings that Columbia acted imprudently and in reckless disregard were completely justified.
 
 
 63
 The Commission went on, however, to find that Columbia's practices did not constitute abuse or justify a denial of passthrough under subsection 601(c)(2) because it found "no evidence that Columbia's customers suffered a significant loss of markets to No. 6 fuel oil during the periods involved," and hence the acquisition practices had no "significant, adverse effect." Opinion No. 204, 26 F.E.R.C. at 61,102. Because, as discussed above, this prong of FERC's test for abuse conflicts impermissibly with the clear congressional intent embodied in subsection 601(c)(2),[38] we remand for the Commission to reconsider the allegations that Columbia violated the NGPA. Passthrough should be denied for any amounts Columbia paid for gas that were excessive as a result of the pipeline's reckless disregard.[39] We stress that on reconsideration the Commission may find that Columbia did not violate subsection 601(c)(2) if none of the amounts it paid for gas were excessive.
 
 B. Excessive Purchases
 
 64
 The protestors object to Columbia's purchases of section 107 gas at high cost and in large quantities and contend that these purchases have resulted in a substantial surplus on the pipeline's system. The ALJ found that "Columbia purchased high-cost Section 107 gas, well in excess of its system supply requirements, resulting in a substantial surplus and a sharply increased cost of gas to its customers." Initial Decision, 22 F.E.R.C. at 65,357. He concluded that while it had not been shown that this practice constituted an "abuse" under subsection 601(c)(2) of the NGPA, Columbia's techniques of estimating its needed supplies were inadequate and the pipeline should have deferred some of its acquisitions. In sum, he found the pipeline's purchasing practices to be "unjust, unreasonable and harmful to the public interest." Id. at 65,358.
 
 
 65
 The Commission took issue with this conclusion and determined that Columbia's purchases were neither abusive nor imprudent. In Opinion No. 204, the Commission held that Columbia's purchases were justified to ensure a long-term gas supply and that the pipeline had shown that the short-term surplus was due to the economic recession, which had both reduced the demand for gas in Columbia's market area and increased the volume flowing to Columbia from its pipeline suppliers. 26 F.E.R.C. at 61,117. In Opinion No. 204-A, the Commission modified this stance. Columbia's argument relied on projections of its surplus gas supply, which the Commission rejected, finding they were flawed by the pipeline's failure to consider switching to alternative fuels. By treating its projections as reasonable except for the effects of the recession, Columbia's argument "assumes away the very question" of the cause of its surplus. 26 F.E.R.C. at 61,718. But, while rejecting Columbia's position, the Commission faulted the protestors for not establishing that the pipeline's contracts resulted in an excessive gas supply independently of the effects of the recession. It concluded that "there is insufficient basis in the record to support the [ALJ's] holding that Columbia acquired excessive reserves through 1990 and should have deferred some acquisitions until after 1985." Id.
 
 
 66
 It is the responsibility of the reviewing court, in determining if the Commission's factual conclusions are supported by substantial evidence, "to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." West Virginia Public Services Comm'n v. United States Dep't of Energy, 681 F.2d 847, 853 (D.C.Cir.1982) (quoting, with emphasis added, Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968)). This court has emphasized that this reasoned consideration is "the ultimate issue in judicial review of [agency] determinations." Public Service Comm'n of New York v. FPC, 511 F.2d 338, 345 (D.C.Cir.1975). In its appraisal of Columbia's natural gas purchases, the Commission failed to consider adequately evidence that the pipeline acquired excessive supplies. We are thus unable to conclude that its determination is supported by substantial evidence.
 
 
 67
 The protestors cite extensive evidence in support of their contention that Columbia purchased supplies of section 107 gas that could not be justified in the short-term because of a concurrent surplus and could not be justified in the long-term because the fields would cease to provide significant quantities of gas. First, Columbia's own evidence indicates that demand for its gas began to decline in April 1980 due to the recession. Opinion No. 204, 26 F.E.R.C. at 61,102. Yet Columbia signed many of its section 107 contracts, including the most onerous ones, between June 1980 and May 1981. Columbia was experiencing a serious surplus at this time, see Initial Decision, 22 F.E.R.C. at 65,335, and during the summer of 1980 initiated a program of cutbacks from its suppliers in an attempt to cope with this problem, Joint Appendix ("J.A.") 784-85.
 
 
 68
 Second, this surplus was not a transitory phenomenon. In 1981, the pipeline projected a surplus supply until the middle of the decade,[40] and, in 1982, it applied to the Commission for authority to sell gas from its surplus in an off-system sale for a term ending October 31, 1986. See 22 F.E.R.C. at 65,357. Columbia attempts to justify its purchases during this period of surplus by arguing that they were necessary as part of its long-term acquisition program, designed to ensure an adequate supply of gas in the future. J.A. 778, 781, 783. While Columbia's attempt to acquire a reliable future supply is laudatory, especially given the shortages on the pipeline's system in the late 1970's, some of Columbia's section 107 gas purchases could not even conceivably serve that goal.
 
 
 69
 FERC does not dispute, nor even discuss, the fact that of the twenty-eight contracts for section 107 gas at issue in this case, no less than ten expire in 1986 or earlier. See J.A. 111, 113, 154, 276, 284. None of these contracts can be justified as contributing to a long term supply. In addition, Mr. Donkin, an Office of Consumers' Counsel witness, testified that certain of Columbia's contracts are for gas from fields that were expected to be substantially depleted by 1985.[41] Columbia's contractual provisions also lessened the long-term value of its acquisitions. The high take-or-pay clauses required it to take nearly the maximum amount deliverable and thus guaranteed that depletion would progress at maximum rates. Moreover, Columbia's market-out clauses typically contain an apparently unique provision that potentially jeopardizes the availability to Columbia of section 107 gas as a long-term source of supply. These clauses give the producer the option to exercise the market-out clause and allow it to replace Columbia with another purchaser if it receives a higher price offer.[42]
 
 
 70
 The Commission places great weight on the fact that in 1979 and 1980 Columbia projected a modest gas surplus for 1981 and none thereafter. Thus, it concludes that Columbia's acquisitions were justified in light of its projections of needed gas supply. Opinion No. 204-A, 26 F.E.R.C. at 61,717. The Commission seems to overlook that elsewhere in the same opinion it concluded that Columbia's calculations of the amount of gas it should purchase were faulty because the pipeline failed to factor in the effect of the price it was paying. See, e.g., id. at 61,716. Even if FERC's conclusion is correct that Columbia's omission did not increase rates to the point of stimulating fuel-switching, that does not vindicate projections based on assumptions so inadequate that the Commission was forced to characterize them as evidence of reckless disregard.
 
 
 71
 The Commission not only fails to address adequately the evidence that Columbia's purchases may have been excessive and may have contributed to the surplus, but its alternative explanation for the pipeline's surplus is not supported by the record. After rejecting Columbia's argument that the difference between its surplus projections made as of 1979-1980 and its higher projections made in 1981 was entirely due to the recession, the Commission produced its own figures and reached the same conclusion, finding that the discrepancy between projections "appears to be largely attributable to the recession." Id. at 61,719. However, the Commission's conclusion is also unsupported in that FERC relied not on an actual estimate of the reduction in customer demand due to the recession, but on a hypothetical figure used by one of Columbia's witnesses in a discussion of the accuracy of customers' estimates of their requirements. See J.A. 566. In sum, we can find no good evidence indicating what portion of Columbia's surplus can be attributed to the effects of the recession. On remand, the Commission should consider the protestors' evidence that, even with the recession, certain of Columbia's purchases could not be justified as providing either short- or long-term supplies.
 
 C. Contract Terms
 
 72
 Although the Commission did not conclude that Columbia had purchased excess gas, it did not attribute Columbia's surpluses entirely to the recession. To the contrary, it determined that "it appears that Columbia's surplus has been caused, in part, by operation of certain of the terms of its contracts." Opinion No. 204, 26 F.E.R.C. at 61,118. While the Commission found that "Columbia paid no more for gas than was required by competitive market conditions and that its agreement to terms and provisions necessary to acquire gas supplies cannot be judged imprudent," id. at 61,119, it also found that the high (85% or 90%) take-or-pay requirements in most of Columbia's section 107 contracts had become unreasonable and violated section 5 of the NGA, id. at 61,119-20. This finding was clearly supported by evidence of the onerous effects of the take-or-pay clauses. However, in its conclusion that no other contract provisions violated section 5, the Commission fell far short of the requirement that it give reasoned consideration to all the pertinent factors. We remand for further consideration of Columbia's contract terms and their effects.
 
 
 73
 As recognized by the Commission, Columbia's high take-or-pay requirements "greatly increase[ ] the cost of Columbia's overall gas supply by (1) forcing high-priced gas into the system while (2) forcing low-priced gas off the system." Id. at 61,120. Not only do these provisions require the pipeline to take, or in any event pay for, 85% or 90% of the gas deliverable by the producer, but when a contract covers gas in more than one NGPA price category, they give the producer the right to withhold cheaper supplies and deliver only high-cost gas if a cutback is necessary. J.A. 785. These restrictions necessarily channel the bulk of Columbia's cutbacks to low-priced gas, which effectively replaces low-priced with high-priced gas and increases the rolled-in cost for the entire system. The resulting increases in rates further reduce demand and necessitate further cutbacks. Columbia is also typically required to assume the same take-or-pay obligations for new wells drilled on acreage covered by its contracts, which displaces even more low-priced gas and contributes further to the spiral of costs. 26 F.E.R.C. at 61,120. The Commission was clearly justified in and adequately explained its finding that the effects of Columbia's take-or-pay provisions were imprudent.
 
 
 74
 The Commission's validation of Columbia's other contract provisions was based on testimony of Mr. Callahan, President of CGD, Columbia's affiliated producer, who had negotiated Columbia's contracts with Southwest producers. Mr. Callahan explained that provisions favorable to the producers of section 107 gas had been made only after other offers proved inadequate, and presented a compilation of Columbia's unsuccessful contract offers, which he testified were turned down, in the majority of instances, in favor of offers with a higher price or more generous contract terms. Mr. Callahan also stated that producers were generally insisting on the price escalation, favored nation and take-or-pay provisions that Columbia agreed to in its section 107 contracts and that such clauses were commonplace in the industry. J.A. 730-32.
 
 
 75
 In relying so heavily on the testimony of Mr. Callahan, the Commission fails to evaluate this testimony in light of its finding, elsewhere in the opinion, that the negotiating relationship with Columbia placed Mr. Callahan in a conflict of interest. See 26 F.E.R.C. at 61,116. Protestors allege that this conflict of interest taints Mr. Callahan's testimony on the necessity for Columbia's onerous contractual provisions, yet the Commission makes no mention of its order that Columbia and CGD terminate their negotiating arrangement.
 
 
 76
 Even more troubling are the issues raised by Commissioner Hughes in his separate concurring and dissenting statement. In its opinions, the Commission makes no effort to respond to his disagreement with the implication of the majority that Columbia's contracts were no different than those of other interstate pipelines. While favored nation and indefinite escalator clauses were commonly incorporated in section 107 gas contracts, Commissioner Hughes finds Columbia's market-out provisions, which could not even be exercised until January 1, 1985, to be a "clearly distinguishable" contract term.[43] In its brief, FERC retreats to the position that "[t]he record appears to be inconclusive as to whether Columbia's market out provisions are typical." Brief for Respondent Federal Energy Regulatory Commission at 58 n. 63. Yet, Commissioner Hughes notes that even if the record were deficient on this point, the Commission could have taken official notice that other pipelines had already exercised market-out provisions. Because Columbia's contracts either had no market-out provision or had one that could not be exercised until 1985, Columbia had no means of relief in the event that its gas became unmarketable at contract prices.
 
 
 77
 Even if we indulge the seemingly erroneous assumption that Columbia's contractual terms were no different than those of other pipelines, the Commission does not explain how that similarity can justify the provisions as a whole, but seemingly cannot save the take-or-pay clauses. It is undisputed that high take-or-pay clauses were common in the industry's section 107 contracts. Yet, that in no way prevented the Commission from condemning them, both in this case and in a general policy statement.[44] Thus, even if certain terms are ubiquitous, that alone is an inadequate justification, one plainly inconsistent with Commission practice.
 
 
 78
 More fundamentally, the acceptance of certain contractual terms by other pipelines is not in itself sufficient to justify Columbia's provisions. Other pipelines may have had a lower cost-base or greater need for additional supplies of gas; they may have limited the proportion of section 107 gas in their overall gas mix to a greater extent than Columbia; or they may have agreed to higher prices but lower take-or-pay requirements. In short, the Commission failed to consider the interactions between the pipeline's contractual provisions and other aspects of Columbia's conduct.
 
 
 79
 Moreover, the Commission looked at each of Columbia's contract clauses individually, and failed to evaluate whether their operation in concert made Columbia's agreements abusive or imprudent. The favored nation and escalator clauses guaranteed that Columbia's new gas would be priced at the highest end of the market; the high take-or-pay clauses prevented the pipeline from controlling its mix of gas and ensured that the full force of the high prices would be felt in the pipeline's rolled-in costs; and the lack of effective market-out provisions removed any flexibility to adjust to changing economic conditions or to competition from alternative fuels. In short, Columbia seems to have relinquished all ability to respond to such variables as unpredictable weather, volatile oil prices and normal cycles of economic activity.
 
 
 80
 Because the ALJ examined Columbia's contractual provisions as a whole, and in conjunction with its other purchasing practices, he did not require a comparison to other pipelines' terms. The narrow approach taken by the Commission and the fact that other pipelines' contracts were not introduced into the record[45] led FERC to conclude that the protestors did not carry the burden of proving that Columbia's contract terms were more egregious than those of other pipelines. Although Process Gas Consumers Group and other petitioners dispute FERC's assignment of this burden, it is clear that the protestors do carry the burden of proof.[46] However, "assigning the burden of proof is not a magic wand that frees an agency from the responsibility of reasoned decisionmaking." Kansas Gas & Electric Co. v. FERC, 758 F.2d 713, 721 (D.C.Cir.1985). It is patently unfair for the Commission to require the protestors to compare Columbia's contracts with those of other pipelines while at the same time denying the protestors access to the information necessary for this proof. At the time of the hearing in this case, the terms of all gas purchase contracts at issue in challenged PGA filings were secret pursuant to protective orders granted by the Commission.[47] In addition, while FERC has received requests and apparently has the authority pursuant to subsection 315(c) of the NGPA, 15 U.S.C. Sec. 3375(c) (1982), to require first sale purchasers to file their contracts with the Commission, it has never done so. If the Commission really believed that evidence of other pipelines' contract terms was essential to evaluate Columbia's compliance with subsection 601(c)(2), it was incumbent upon it to make the necessary evidence available, or at least to take official notice of information already in its possession.
 
 
 81
 Finally, the Commission inadequately explains its conclusion that the onerous terms in Columbia's contracts with its affiliated producer are justified by their inclusion in Columbia's other contracts. It cites a longstanding Commission practice of treating affiliates in a manner similar to nonaffiliated companies and states that this treatment of CGD's contracts is consistent with the "affiliated entities" limitation of section 601(b)(1)(E) of the NGPA, 15 U.S.C. Sec. 3431(b)(1)(E). Yet, the affiliated entities test, which limits amounts recovered from affiliates to "the amount paid in comparable first sales between persons not affiliated," id., and the precedents cited for the Commission's longstanding practice,[48] deal only with comparable treatment of rates. Merely citing the practice, without more, does not justify extending the policy to include all contractual terms. On remand, the Commission should consider Columbia's justifications for the terms in its contracts with CGD.
 
 D. Cutbacks
 
 82
 The ALJ determined that Columbia's purchases of substantial quantities of deregulated section 107 gas at high prices during a period of surplus, coupled with Columbia's "voluntary actions to reduce its takes of less expensive gas while continuing takes of high-cost gas above the take-or-pay level," resulted in payments of "excessive" prices by Columbia and constituted an abuse that warranted a denial of passthrough. Initial Decision, 22 F.E.R.C. at 65,345. In response to protestors' claims that Columbia failed to cut back its takes in a manner that would minimize costs to customers and consumers, the pipeline listed twelve practical considerations in defense of its procedures. The ALJ examined each defense individually and concluded that Columbia's contentions were, "for the most part, vague, speculative and unexplained in the record" and "in certain instances, [were] contrary to the provisions of Columbia's gas purchase agreements." Id. at 65,338. The ALJ made detailed findings based on the record for each category of Columbia's purchases, determining that Columbia did not cut back according to price either within each category or among the sources, and found that Columbia's testimony did not justify this failure to minimize prices.
 
 
 83
 In contrast, the Commission held that the record did "not support a finding that Columbia's cutback policies and practices [were] abusive." Opinion No. 204, 26 F.E.R.C. at 61,106. It relied on the testimony of Columbia's witness, Mr. Howard, who stated that "Columbia's general policy is to cut back first on the highest priced gas supplies, consistent with operational limitations, provided that no gas is cut back to below take-or-pay levels," and described operational limitations that prevent a full cutback of section 107 suppliers prior to other sources. Id.[49] In rejecting the ALJ's findings, the Commission also relied on data introduced for the first time in Columbia's brief on exceptions to the ALJ's Initial Decision. The Commission characterizes the information in the brief as "for the most part an explanation and further development of the various factors discussed by [Columbia's] witness." Id. at 61,106. However, the brief contained specific facts and figures regarding production in the Appalachian area and data regarding Columbia's pipeline purchases and sources of supply; none of this information was even mentioned in Mr. Howard's original testimony. There is no doubt that the Commission relied heavily on this ex parte material; Opinion No. 204 cites Columbia's brief and quotes it extensively. See id. at 61,107-08. There is also no doubt that if the evidence had been properly included in the record it would have been disputed.[50]
 
 
 84
 If all of the disputed evidence had been properly introduced at the hearing, and if the Commission had then evaluated the record as a whole, it is possible that it could have found that Columbia's cutback practices were not abusive. However, the Commission could not conceivably reach that conclusion on the record that was properly before it. In relying on ex parte submissions appearing in a post-hearing brief, the Commission violated fundamental canons of due process. This is made clear by reference to the Commission's own rules, establishing procedures that prevent the Commission from relying on evidence submitted ex parte. Rule 2201 prohibits ex parte communications in general and defines that term as "an oral or written communication relative to the merits of an on-the-record proceeding pending before the Commission which is not on the public record and with respect to which reasonable prior notice to the parties is not given." 18 C.F.R. Sec. 385.2201(a) (1985). In addition, Rule 505 gives participants in hearings before the Commission the right to present evidence, including rebuttal evidence, and to cross-examine "as may be necessary to assure true and full disclosure of facts." Id. Sec. 385.505. The rules also provide that the presiding officer at a hearing will designate the time at which the evidentiary record shall close. After that time, evidence may not be added to the record, unless it is officially reopened under Rule 716. Id. Sec. 385.510(c).
 
 
 85
 Not only was the Commission's action a violation of its own rules, but its general disposition on cutbacks was inexplicable when compared to its treatment of cutbacks of Columbia's own production and that of its affiliate, CGD. FERC held that the protestors had failed to carry their burden of proof with respect to Columbia's cutbacks of Appalachian, Southwest and pipeline takes. However, on the issue of cutbacks of Columbia's and CGD's production, the Commission found that "[t]he record is not sufficient to determine whether Columbia followed its stated cutback policy" and remanded for additional hearings on the question of abuse. Id. at 61,111. Rather than rely on extra-record evidence, it easily could have remanded and reopened the record on cutbacks of the other categories of supply.
 
 
 86
 Finally, the Commission found that the cutback practices were, for the same reasons stated in its analysis of abuse, not unreasonable and therefore not a NGA violation. Id. This conclusion is also infirm for its reliance on extra-record material. On remand, the Commission is free to consider Columbia's evidence in further deliberations on this matter, so long as this evidence is properly introduced in the record and protestors are given a full opportunity to cross-examine and offer rebuttal evidence.
 
 V. REMEDY
 
 87
 The Commission found that two aspects of Columbia's gas acquisition practices violated section 5 of the NGA--its high take-or-pay clauses and its failure to consider marketability in its gas purchasing. As remedies, it directed Columbia to "take all reasonable action to mitigate the effect of take-or-pay provisions in its section 107 contracts" and adopted a contested offer of settlement made by Columbia in a section 4 rate case covering the period from January 1, 1983 to April 30, 1984.[51]
 
 
 88
 As a general proposition, we will not second-guess FERC judgments on remedies and sanctions developed pursuant to proceedings before the Commission. See, e.g., Panhandle Eastern Pipe Line Co. v. FERC, 777 F.2d 739, 746 (D.C.Cir.1985); Columbia Gas Transmission Corp. v. FERC, 750 F.2d 105, 109 (D.C.Cir.1984). Our review of such matters extends only far enough to ascertain that the action taken by the Commission has a rational basis, see Columbia Gas Transmission Corp., 750 F.2d at 109, and that FERC's orders, "viewed in light of the relevant facts and of the Commission's broad regulatory duties, [have not] abused or exceeded its authority." Office of Consumers' Counsel v. FERC, 655 F.2d 1132, 1142 (D.C.Cir.1980) (quoting Permian Basin Area Rate Cases, 390 U.S. 747, 791, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968)).
 
 
 89
 FERC's authority to remedy Columbia's imprudence is found in section 5(a) of the NGA, which provides, in pertinent part:
 
 
 90
 Whenever the Commission ... shall find that any ... practice, or contract affecting such rate ... is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable ... practice, or contract to be thereafter observed and in force, and shall fix the same by order.
 
 
 91
 5 U.S.C. Sec. 717d(a) (emphasis added). This court has recognized that the Commission's authority pursuant to section 5 is properly exercised in two steps:[F]irst, the Commission must find that an existing condition is unjust or discriminatory; second, the Commission must prescribe the remedy for that condition.
 
 
 92
 American Smelting and Refining Co. v. FPC, 494 F.2d 925, 940-41 (D.C.Cir.), cert. denied, 419 U.S. 882, 95 S.Ct. 149, 42 L.Ed.2d 122 (1974).
 
 
 93
 The Commission asserts that the settlement agreement gives Columbia an incentive to improve the marketability of its gas because the rates in the agreement were based on sales volumes higher than those Columbia was actually achieving, thus putting the pipeline's equity at risk. The protestors strongly dispute the adequacy of this measure as a remedy for Columbia's reckless disregard on several grounds.[52] We need not evaluate the protestors' contentions, nor determine whether the alleged remedial shortcomings eliminate any rational basis for FERC's action in this case, because we find that the Commission acted without appropriate authority in relying on the settlement agreement to determine a remedy.
 
 
 94
 The Commission defends its choice of remedy as within its broad discretion. Yet, even the Commission's broad discretion is bounded by the limits of its authority and the necessity for rational decisionmaking. For us to hold that the Commission's reliance on the disputed settlement agreement falls within those bounds would be to render the limits on FERC's remedial discretion completely illusory.
 
 
 95
 The settlement agreement not only concerned a completely separate and unrelated proceeding--a section 4 general rate filing for a time period subsequent to the PGA filing at issue here--but it also explicitly reserved the issue of gas acquisition practices, the very issue the Commission sought to remedy with its reliance on the settlement agreement. See 25 F.E.R.C. p 63,050, at 65,125. The parties to the settlement were unable to agree whether issues regarding gas acquisition practices should be resolved in general rate or PGA proceedings. As a result, they reserved their rights, awaiting the Commission's determination of that issue in Opinion No. 204. In Opinion No. 204, the Commission found that certain of Columbia's gas acquisition practices did violate section 5, yet it made a mockery of that conclusion by turning for a remedy to the partial settlement that completely excluded that same issue.
 
 
 96
 In its brief, FERC characterizes the use of the settlement as a "rate design remedy [that] is a standard purchasing practices remedy used by the Commission." Brief for Respondent Federal Energy Regulatory Commission at 50. Yet the only case cited as an example of such a remedy is El Paso Natural Gas Co., 23 F.E.R.C. p 61,365 (May 31, 1983), clarified, 25 F.E.R.C. p 61,106 (Oct. 20, 1983). Unlike the settlement at issue here, the rate design in the El Paso settlement was not adopted as a remedy in an unrelated proceeding. In that case, issues regarding the pipeline's purchasing practices raised in a PGA proceeding were formally referred to a then-current section 4 rate case, which was settled shortly thereafter. Thus the settlement, which was uncontested, encompassed the purchasing practices issue. See 25 F.E.R.C. at 61,333.
 
 
 97
 The approach followed in this case is plainly antithetical to the usual exercise of FERC remedial authority. And, most importantly, there is no justification whatsoever for FERC's departure from normal practice in this case. The Commission itself has stressed that a settlement is confined to the single proceeding in which it is adopted:
 
 
 98
 Like any settlement of a contested proceeding pending before the Commission, approval of the Settlement Agreement will not establish principles or precedent or control future proceedings or otherwise "settle issues." We need not inquire why the parties to the proceeding supporting (or not opposing) the Settlement Agreement have taken their respective position. It is the essence of a settlement agreement that the participants can agree on an end result without necessarily agreeing upon the reasoning, data, analyses or principles which led to the agreement.
 
 
 99
 General Public Utilities Corp., 13 F.E.R.C. p 61,002, at 61,006 (Oct. 1, 1980). Similarly, in Continental Oil Co. v. FPC, 373 F.2d 96 (10th Cir.1967), the Tenth Circuit held that the FPC had exceeded the broad scope of its remedial power by including certain parties in a rate proceeding in reliance on a settlement agreement which contemplated otherwise. The court observed:
 
 
 100
 We think that the reasoning of the Commission violates both the simple wording of the settlement agreement and the underlying purpose of the agreement....
 
 
 101
 This court has long recognized the right of the Commission to set the scope of its proceedings and to utilize its administrative tools within the broadest of discretions, subject only to a prohibition against the denial of a specific right. But settlement agreements are encouraged for the very purpose of setting rights, providing for stability in the exercise of those rights, and, unless such agreements run afoul of the Natural Gas Act or the public good, should be interpreted to accomplish the clear and stated purpose contained therein. Such an agreement "should stand for what it says."
 
 
 102
 Id. at 100 (emphasis added, citations omitted) (quoting Texas Eastern Transmission Corp. v. FPC, 306 F.2d 345, 348 (5th Cir.1962), cert. denied, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963)). The Commission's decision here violates the well-established principles enunciated in these and other like precedents.
 
 
 103
 The settlement agreement in Docket Nos. RP82-120 et al. was not intended by the parties to settle any issues concerning Columbia's gas acquisition practices, let alone to serve as a remedy for those practices. As such, the Commission's use of the agreement was an abuse of authority. Moreover, if the Commission is permitted to extend the application of settlement agreements in this fashion, it will serve as a deterrent to future settlements. Parties will naturally hesitate to agree on specific issues if they risk a broader, and unintended, application of that agreement in separate proceedings.
 
 
 104
 The Commission's remedy for the violation attributed to the high take-or-pay clauses in Columbia's section 107 contracts is also infirm. The Commission contends that it is within its discretion to simply urge Columbia to mitigate its contractual terms and hints that relief might be forthcoming in later PGA dockets if Columbia's imprudence continues.[53] No matter how this action is viewed, it is devoid of a remedy. Because the Commission has no authority to decline to issue a remedy where a clear violation has been found,[54] we must reverse and remand.
 
 
 105
 We do not presume to dictate or even suggest appropriate remedies for Columbia's section 5 violations. In reformulating its remedies on remand, the Commission should adhere to the strictures of section 5 of the NGA which stipulates that FERC shall determine and order "the just and reasonable ... practice, or contract to be thereafter observed." 15 U.S.C. Sec. 717d(a) (1982).
 
 VI. CONCLUSION
 
 106
 For the reasons heretofore indicated, we affirm in part, and reverse and remand in part.
 
 
 107
 We affirm the first prong of the Commission's test of "abuse" under subsection 601(c)(2) of the NGPA; however, because the second prong of the test is either flatly at odds with the plain meaning of the statute or incomprehensible, we reverse FERC's judgment on this point and remand for further consideration.
 
 
 108
 On remand, FERC will be required to reconsider its interpretation of abuse and construct a new test that adheres to the statutory requirement that passthrough be denied when abuse results in excessive payments. Thereafter, the Commission will be required to reevaluate all of Columbia's challenged conduct in light of the revised test of abuse.
 
 
 109
 We affirm the Commission's findings of imprudence regarding Columbia's practices on marketability and take-or-pay contract clauses; however, we remand for further consideration of the appropriate remedies for these violations. We also remand for further consideration of the claims of imprudence with respect to Columbia's excess supply and cutback practices and the other contested contract clauses.
 
 
 110
 In developing remedies, we stress that the Commission must consider the entire record as a whole, then act pursuant to reasoned decisionmaking and abjure reliance on any ex parte or extra record evidentiary submissions.
 
 
 111
 So ordered.
 
 
 
 [1]
 The intervenors filing briefs in support of Columbia's position are Interstate Natural Gas Association of America, Texas Eastern Transmission Corporation, Transwestern Pipe Line Company and amicus curiae El Paso Natural Gas Company. Other intervenors did not file briefs
 
 
 [2]
 For convenience, this group will be referred to as the "protestors." These petitioners are the Office of Consumers' Counsel, State of Ohio, Associated Gas Distributors, Baltimore Gas and Electric Company, Cities of Charlottesville and Richmond, Virginia, Citizen/Labor Energy Coalition, the Process Gas Consumers Group and Public Service Commission of the State of New York. The Georgia Industrial Group, the American Iron & Steel Institute, Maryland Peoples' Counsel, Office of Consumer Advocate for the Commonwealth of Pennsylvania and UGI Corporation intervened and filed briefs in support of these petitioners
 
 
 [3]
 The costs of acquiring natural gas are generally included in pipelines' rates as a weighted average of the costs of gas purchased from many sources. Thus a pipeline that acquires high-cost supplies of gas can "roll-in" those costs with its "cushion" of low-priced supplies. The exception to this practice is a limited form of selective incremental pricing adopted by Congress in Title II of the NGPA, which requires large-volume industrial consumers of natural gas boiler fuel to pay a disproportionate amount of certain gas acquisition costs. See 15 U.S.C. Secs. 3341-3348 (1982)
 
 
 [4]
 See Order No. 452, 47 F.P.C. 1049 (1972); Order No. 452-A, 47 F.P.C. 1510 (1972)
 
 
 [5]
 See, e.g., 124 CONG.REC. 31846 (Sept. 27, 1978) (remarks of Sen. Jackson)
 
 
 [6]
 Four categories of domestically produced natural gas, referred to as "section 107" or "high cost" gas, were the first to be exempted from price controls. 15 U.S.C. Sec. 3331(b) (1982). Section 107 gas consists of "deep-gas," produced from depths greater than 15,000 feet in new wells; gas from geo-pressured brine; occluded gas from coal seams; and gas from Devonian shale. Id. at Sec. 3317(c)
 
 
 [7]
 "First Sales" include sales of gas produced by the pipeline as well as sales to pipelines by independent producers. Public Service Comm'n of New York v. Mid-Louisiana Gas Co., 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983)
 
 
 [8]
 All ceiling prices escalate over time according to statutory formulas specific to each category of gas. See, e.g., 15 U.S.C. Secs. 3312(b)(2), 3313(b)(1)(B) (1982)
 
 
 [9]
 See Opinion No. 204, 26 F.E.R.C. at 61,100
 
 
 [10]
 "Purchases" refers to acquisitions of new gas supplies, while "takes" is used to describe gas taken under existing contracts
 
 
 [11]
 Columbia purchases gas at varying prices from five major sources of supply: pipeline suppliers, Appalachian producers, Southwest (Louisiana) producers, Columbia's own pipeline production and Columbia's affiliated producer, Columbia Gas Development Corporation
 
 
 [12]
 Docket No. TA81-1-21. Columbia Gas Transmission Corp., Order Accepting for Filing and Suspending Proposed Tariff Sheets Subject to Refund and Subject to Conditions, 14 F.E.R.C. p 61,202 (Feb. 28, 1982). A PGA calculation has two components. The first adjusts a pipeline's rates for the following six months based on current estimates of the cost of gas. The second component is a surcharge that accounts for actual gas costs in the preceding six months and modifies the rates for under- or over-collections of costs of purchasing gas. See El Paso Natural Gas Co. v. FERC, 677 F.2d 22, 23 (5th Cir.1982)
 
 
 [13]
 Docket No. TA81-2-21. Order Accepting for Filing and Suspending Proposed Tariff Sheets, Subject to Conditions, Consolidating Proceedings, and Establishing Procedures, 16 F.E.R.C. p 61,160 (Aug. 31, 1981)
 
 
 [14]
 No. 6 fuel oil is a low grade, residual fuel oil often used to fire large commercial and industrial boilers. No. 2 fuel oil, commonly used as home heating oil and also burned by commercial and industrial users, is a more expensive, higher grade distillate
 
 
 [15]
 The market-clearing price for natural gas is the price that, when added to the cost of transporting and distributing the gas, equals the price of No. 6 fuel oil
 
 
 [16]
 Columbia purchases approximately four percent of its gas from CGD. Initial Decision, 22 F.E.R.C. at 65,356
 
 
 [17]
 Take-or-pay provisions require a pipeline to take, or pay for if not taken, a specified amount of gas. Columbia's contracts typically required it to take-or-pay for 85% to 90% of the daily delivery capacity of section 107 wells, averaged over a year
 
 
 [18]
 Columbia's favored nations pricing clauses gave producers the option to charge Columbia the average of the two or three highest prices paid by any pipeline in a large producing region, e.g., southern Louisiana
 
 
 [19]
 Columbia signed escalator clauses that gave producers the option to charge up to 110% of the price of No. 2 fuel oil and allowed them to escalate gas costs indefinitely
 
 
 [20]
 Market-out or marketability clauses typically permit a pipeline to renegotiate its gas purchase prices if such prices are too high to permit the pipeline to sell at marketable rates. Many of Columbia's section 107 gas contracts contained no market-out clauses at all and even when included, they could not be exercised before January 1985
 
 
 [21]
 Opinion No. 204, 26 F.E.R.C. at 61,105-11. However, the Commission held that the record was not sufficient to determine if Columbia's cutbacks of its own pipeline production, which is not subject to take-or-pay restrictions, and of CGD's production constituted abuses under NGPA section 601(c)(2) and remanded these matters for additional hearings. Id. at 61,111. The remanded cutback issues were consolidated with contested PGA filings covering the period of March 1, 1982 to February 28, 1985, and were settled in an agreement approved by the Commission in Columbia Gas Transmission Corp., 31 F.E.R.C. p 61,307 (June 14, 1985), reh'g granted, 31 F.E.R.C. p 61,372 (June 25, 1985)
 
 
 [22]
 Docket Nos. RP82-120-006, RP82-119-003
 
 
 [23]
 Opinion No. 204, 26 F.E.R.C. at 61,112-13. A pipeline's rates usually consist of two parts, a demand charge and a commodity charge. The demand charge is usually a fixed rate billed on the basis of the maximum volume of gas a customer is entitled to purchase on a given day, while the commodity charge is billed on the basis of the actual units of gas taken. The commodity charge is calculated to recover all Columbia's variable costs plus 75% of its fixed costs. Thus Columbia risks underrecovery of the fixed costs allocated to the commodity charge if it fails to achieve the sales volume used to calculate its rate. See Consolidated Gas Supply Corp. v. FPC, 520 F.2d 1176, 1188 (D.C.Cir.1975). The settlement rates were based on a sales volume of 1,076 million Mcf, while Columbia's sales volume for the year ending August 30, 1983 was 775 million Mcf. Opinion No. 204-A, 26 F.E.R.C. p 61,334, at 61,723 (Mar. 16, 1984)
 
 
 [24]
 The Commission declined to rule on whether Columbia's own gas production from tight formations is eligible for incentive prices, Opinion No. 204, 26 F.E.R.C. at 61,121, because this issue was the subject of an ongoing rulemaking proceeding. See 49 Fed.Reg. 33,849 (1984). The Commission also determined that Exxon Corporation may have violated Sec. 504(a) of the NGPA, 15 U.S.C. Sec. 3414(a), by charging more than the maximum lawful price for regulated gas, and Columbia may have paid extra for deregulated gas as part of the consideration for a sale of regulated gas in violation of a Commission regulation, 18 C.F.R. Sec. 270.207 (1985). The Commission severed this issue and remanded for further factfinding. See Columbia Gas Transmission Corp., 28 F.E.R.C. p 63,005 (July 10, 1984)
 
 
 [25]
 The Process Gas Consumers Group argues that subsection 601(c)(2) restores the Commission's power to review pipeline costs to that which existed before Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), extended regulation to include wellhead prices in sales to interstate pipelines. Brief of Petitioner The Process Gas Consumers Group at 28
 
 
 [26]
 Subsection 601(c) provides in pertinent part:
 (c) Guaranteed passthrough
 ....
 (2) Recovery of just and reasonable prices paid.
 For purposes of sections 4 and 5 of the Natural Gas Act [15 U.S.C. 717c, 717d], the Commission may not deny any interstate pipeline recovery of any amount paid with respect to any purchase of natural gas if--
 (A) under subsection (b) of this section, such amount is deemed to be just and reasonable for purposes of sections 4 and 5 of such Act [15 U.S.C. 717c, 717d], and
 (B) such recovery is not inconsistent with any requirement of any rule under section 3341 of this title (including any amendment under section 3342 of this title),
 except to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds.
 15 U.S.C. Sec. 3431(c)(2) (1982).
 
 
 [27]
 See N. SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION Sec. 46.06 (rev. 4th ed. 1984)
 
 
 [28]
 STAFF OF H.R. COMM. ON INTERSTATE AND FOREIGN COMMERCE AND S. COMM. ON ENERGY AND NATURAL RESOURCES, 95TH CONG., 2D SESS., NATURAL GAS PRICING AGREEMENT ADOPTED BY THE CONFEREES ON H.R. 5289, at 19 (Comm. Print 1978)
 
 
 [29]
 H.R. 5289, 95th Cong., 2d Sess., Conference Discussion Draft of the Conference Report to Accompany H.R. 5289, Aug. 16, 1978, at 170, reprinted in Brief of Petitioners Cities of Charlottesville and Richmond, Virginia, App. C, at 8
 
 
 [30]
 See, e.g., Brief of Petitioner Associated Gas Distributors at 42-43
 
 
 [31]
 We reject the suggestion that FERC's interpretation of "abuse" would be due deference only if FERC had relied on its precedents and construed the term as the incurrence of "extravagant or unnecessary costs." See Opinion No. 497, 36 F.P.C. 61, 70-71 (1966), aff'd, Midwestern Gas Transmission Co. v. FPC, 388 F.2d 444 (7th Cir.), cert. denied, 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968). This precedent did not concern the proper reading of the term as used in the NGPA and "abuse" is not a term of art that needs a constant usage
 While the protestors are correct in pointing out that the Commission may turn to other statutes that "apply to similar persons, things, or relationships" for guidance in its interpretation of "abuse," N. SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION Sec. 53.03 (rev. 4th ed. 1984), they carry this argument too far; the agency is not compelled to do so. It is also noteworthy that the definitions provided by the statutes held up as examples of proper interpretations of abuse differ among themselves. Compare Comprehensive Employment and Training Act, Pub.L. No. 95-524, Sec. 123(g), 92 Stat. 1909, 1942 (1978) (listing abuses for which funds otherwise payable under CETA programs would be withheld), repealed by Job Training Partnership Act, Pub.L. No. 97-300, Sec. 184(a)(1), 96 Stat. 1322, 1357 (1982), with H.R. REP. NO. 393(II), 95th Cong., 1st Sess. 47-48 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3039, 3049-3050 (defining program abuse in medicare programs to be investigated under 42 U.S.C. Sec. 1320c-15(b), superseded by 42 U.S.C. Sec. 1320c-9(b)(1)(A) (1982)).
 
 
 [32]
 See Atlantic Refining Co. v. Public Service Comm'n of New York, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959)
 
 
 [33]
 Any excessive payment for gas has a direct effect on customers and consumers because it is normally passed through, as guaranteed by the statute, and reflected in the rates charged by the pipeline for gas
 
 
 [34]
 In its brief, agency counsel argues that the Commission's impact test is not "necessarily inconsistent" with the statutory term "excessive." Brief for Respondent Federal Energy Regulatory Commission at 35
 
 
 [35]
 At oral argument, Columbia's counsel argued that FERC's requirement for a "significant, adverse effect" can be a lower standard than the "excessive" amount paid criteria set forth in the statute. He cited a hypothetical situation in which a pipeline's abusive behavior in refusing to purchase needed gas supplies led to a natural gas shortage as an example that would meet the "significant effect" test, yet not produce an excessive price. This hypothetical is entirely inapposite. Without payments to acquire natural gas supplies, a pipeline has no costs to pass through for recovery in its rates and subsection 601(c)(2) is completely inapplicable
 
 
 [36]
 See Initial Decision, 22 F.E.R.C. at 65,355. The Commission previously selected No. 6 fuel oil as the appropriate alternative fuel for the purposes of calculating incremental pricing ceilings under Title II of the NGPA. See Order No. 50, Regulations Implementing Alternative Fuel Price Ceiling on Incremental Pricing Under the Natural Gas Policy Act of 1978, 44 Fed.Reg. 57,754 (1979); Rule Required Under Section 202 of The Natural Gas Policy Act; Incremental Pricing, 45 Fed.Reg. 31,622 (1980)
 
 
 [37]
 Columbia's customer, Baltimore Gas & Electric Company estimated, based on the current capacity of its customers to burn oil, that it would lose 25-28% of its commercial-industrial sales, which make up 56% of its total annual sales, if the cost of natural gas rose above that of No. 6 fuel oil on a long-term basis. Initial Decision, 22 F.E.R.C. at 65,355
 
 
 [38]
 The Commission's focus on whether Columbia's customers suffered a significant loss of markets not only conflicts impermissibly with Congress' requirement of an excessive amount paid, but is moreover a flawed application of the Commission's faulty test. By limiting its inquiry to loss of markets, the Commission ignored the significant adverse effect of gas acquisitions that increase the pipeline's rates but, because they are rolled-in with lower-priced gas costs, may not increase rates to the level that would stimulate fuel-switching. In addition, using significant loss of markets as the criteria for an adverse effect completely ignores the consequences that Columbia's actions and rate increases have on consumers
 
 
 [39]
 The Cities of Charlottesville and Richmond, Virginia, argue that prices in excess of the market-clearing price are excessive and abusive and should be denied passthrough. While under certain circumstances payment of prices above the market-clearing level may be abusive, if this principle were adopted as a general rule it would eviscerate the price deregulation mandated by section 121(b) of the NGPA, 15 U.S.C. Sec. 3331(b) (1982), and the authority granted FERC to raise certain ceiling prices, 15 U.S.C. Sec. 3317(b) (1982)
 
 
 [40]
 In 1979 and 1980, Columbia estimated significant excess supplies through 1981, with no need to obtain new supplies of any magnitude until 1983. In 1981, Columbia's revised forecast predicted a surplus through 1984, and in 1982 it predicted a surplus through 1985. J.A. 597, 613-15, 672, 783
 
 
 [41]
 See J.A. 405-08, 640. The Commission did not address this point in its opinions, but in its brief, FERC characterizes this testimony as "defective," arguing that "most" of Columbia's purchases of section 107 gas from the Southwest are from the Tuscaloosa Trend, whose depletion rates were not studied by Mr. Donkin. Brief for Respondent Federal Energy Regulatory Commission at 47 n. 53. Yet, the best estimate that FERC could cite for the life of the Tuscaloosa Trend reserves was "somewhere from 5 to 13 or 14 years," J.A. 514, figures that are not entirely inconsistent with Mr. Donkin's conclusion. In addition, FERC does not dispute Mr. Donkin's testimony, based primarily on Columbia's own estimates, that the Andrus Cove field, South Lake Arthur field and offshore Gulf of Mexico fields will not provide significant quantities of gas after 1985. See J.A. 404-07
 
 
 [42]
 A market-out contract clause described by Columbia as "typical," J.A. 799, provides as follows:
 At any time after December 31, 1984 and from time to time thereafter, either Buyer or Seller may request the renegotiation of price to be paid for the gas sold and delivered hereunder, in which case the party making such request must demonstrate in good faith that the price being paid does not reflect the market value of the gas being sold in the area where it is produced or the market value of the gas in the area where it is being consumed. In such case the parties shall review the circumstances and supporting data in a good faith effort to rectify the situation by mutually agreeing to a new price or Seller may seek a third party purchaser for the gas. In the event that a bona fide offer is received by Seller from a third party purchaser, Buyer shall have the option either to match such offer and continue to purchase the gas hereunder or to release the gas at issue....
 J.A. 209. The Commission discounts any potential effect of such market-out clauses, citing Columbia's testimony that they would never be invoked because Columbia's price would always be among the highest due to the favored nation clauses also typically included in Columbia's contracts, which tie its prices to the highest paid by other producers. Opinion No. 204-A, 26 F.E.R.C. at 61,719. Yet, as Mr. Donkin points out, this assumption only holds so long as Columbia is willing and able to pay those high prices. J.A. 641. A marketability clause is often invoked in an attempt to reduce prices, but Columbia may not do so without putting its supply at risk.
 
 
 [43]
 27 F.E.R.C. at 61,906-07. See note 42 supra
 
 
 [44]
 See Statement of policy respecting take or pay provisions in gas purchase contracts, 18 C.F.R. Sec. 2.103 (1985) (creating a rebuttable presumption in general rate cases that prepayments pursuant to take-or-pay provisions above 75% of annual deliverability will not be given rate base treatment)
 
 
 [45]
 There is some evidence comparing pipelines in the record. The protestors point to exhibits 31-33, which were drawn from a comparison of 20 pipelines by the FERC staff, Office of Pipeline and Producer Regulation, FERC, NGPA Category Study of 20 Interstate Natural Gas Pipelines (January 22, 1982), cited in Opinion No. 204-A, 26 F.E.R.C. at 61,715, and which indicate that Columbia's average contract price for section 107 gas was greater than average and that it made up a greater portion of Columbia's total gas supply than average. J.A. 669-71. The Commission refuses to rely on these exhibits because the ALJ did not enter the full study into evidence due to inaccuracies. Yet, the ALJ did admit the exhibits in question, no party objected and the protestors argue that the inaccuracies do not affect these exhibits
 
 
 [46]
 The general principle this court has used to determine the burden of proof in NGA cases is that the burden falls on the proponent of the change in rates or policies. See, e.g., ANR Pipeline Co. v. FERC, 771 F.2d 507, 513 (D.C.Cir.1985). The PGA filing procedure was established pursuant to section 4 of the NGA, see, e.g., Associated Gas Distributors v. FERC, 706 F.2d 344, 346 (D.C.Cir.1983), which places the burden of justifying rate increases on the pipeline. However, gas acquisition costs are now "guaranteed" passthrough pursuant to subsection 601(c)(2) of the NGPA and pipelines no longer must prove their reasonableness. The burden thus falls on the protestors, as advocates of the exception to guaranteed passthrough, to prove abuse and excessive payments. In the analysis under section 5 of the NGA, the Commission or a protestor normally carries the burden of showing that practices are unjust, unreasonable, unduly discriminatory or preferential. See, e.g., Mississippi Valley Gas Co. v. FERC, 659 F.2d 488, 503 (5th Cir.1981); Public Service Comm'n of New York v. FERC, 642 F.2d 1335, 1346-48 (D.C.Cir.1980), cert. denied, 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981). Here, where the protestors allege the violation, they carry the burden of proof
 
 
 [47]
 Pipeline contracts were on file with the Commission in challenged PGA proceedings, but in each case the pipeline contended that it would suffer competitive harm if contract terms were disclosed beyond the immediate parties to the case. See, e.g., Transcontinental Gas Pipe Line Corp., Docket Nos. TA81-1-29-002 et al. (protective order imposed 16 F.E.R.C. p 63,043 (Aug. 24, 1981), lifted 19 F.E.R.C. p 63,029 (Apr. 28, 1982)); Michigan Wisconsin Pipe Line Co., Docket No. TA81-2-48-000 (protective order imposed 16 F.E.R.C. p 63,014 (July 28, 1981)); Trunkline Gas Co., Docket No. TA81-1-30-001 (protective order imposed Apr. 3, 1981). A protective order covered Columbia's contracts in this case, 16 F.E.R.C. p 63,021 (Aug. 5, 1981), and was lifted Feb. 8, 1983, 22 F.E.R.C. p 61,137
 
 
 [48]
 See National Rates for Natural Gas, 51 F.P.C. 2212 (1974) (national rate applied equally to independent producers, pipelines and affiliates), aff'd, 520 F.2d 1061 (5th Cir.1975); Public Service Co. of New Mexico, 17 F.E.R.C. p 61,123, at 61,245-46 (Nov. 9, 1981) (cost of coal purchased from affiliate determined by comparison to prices of non-affiliated suppliers)
 
 
 [49]
 We have great difficulty in comprehending the Commission's contention that Mr. Howard's testimony was "unrefuted" because he was not cross-examined on his assertions. Opinion No. 204, 26 F.E.R.C. at 61,107, 61,109. Testimony may be rebutted in several ways other than through cross-examination, and the protestors contend that the testimony of Mr. Howard was amply refuted elsewhere in the record. It is not the role of this court to evaluate that evidence. We merely stress the elementary proposition that the Commission must make its decisions based on the record as a whole
 
 
 [50]
 See, e.g., Brief of Petitioner Baltimore Gas and Electric Company at 23-47
 
 
 [51]
 26 F.E.R.C. at 61,126. The contested settlement in Docket Nos. RP82-120 and RP82-119 had been previously certified to the Commission. 25 F.E.R.C. p 63,050 (Nov. 30, 1983)
 
 
 [52]
 Several petitioners argue that the rates in the settlement are based on the same sales volume estimates that Columbia used in its initial request for a rate increase, i.e., they were not compromised to Columbia's detriment in the settlement. More importantly, the sales volumes themselves are not etched in stone, but subject to alteration in the cases consolidated and set for a hearing simultaneously with the issuance of Opinion No. 204. Columbia Gas Transmission Corp., Order Modifying Prior Orders, Consolidating Cases, and Setting Hearing, 26 F.E.R.C. p 61,036 (Jan. 16, 1984). The Commission concluded in Opinion No. 204 that "the sales volumes underlying [the settlement] rates are set at a level that reflects prudent gas acquisition practices." 26 F.E.R.C. at 61,112. Yet, the settlement agreement explicitly excluded the issue of gas acquisition practices, 25 F.E.R.C. p 63,050, at 65,125, and FERC set this question for a hearing in conjunction with the issues remanded in Opinion No. 204 and contested PGA filings covering the period from March 1, 1982 to February 29, 1984. 26 F.E.R.C. p 61,036, at 61,132
 In addition, the Process Gas Consumers Group challenges the basic premise underlying the Commission's order--that rates based on overestimated sales volumes put Columbia's revenues at risk. It asserts that the sales volume are only half the equation. If costs, which the Process Gas Consumers Group alleges are typically inflated in general rate increase requests and which the Commission did not examine in this settlement, are overestimated as well, then any remedial effect is lacking. Brief of Petitioner The Process Gas Consumers Group at 67 n. 66.
 
 
 [53]
 See Opinion No. 204-A, 26 F.E.R.C. at 61,724-25. At oral argument, FERC's counsel cited Sebring Utilities Comm'n v. FERC, 591 F.2d 1003 (5th Cir.), cert. denied, 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979), for the proposition that relief could be delayed to a later time. However, the circumstances in Sebring bear no relationship to those in the case before us. Sebring concerned a challenge to a pipeline's gas curtailment plan. The ALJ in the case bifurcated the hearing so that if he determined the existing plan was discriminatory in phase I, he would hear evidence on a new plan in phase II. The Commission concluded that the existing plan was unduly discriminatory and yet decided not to impose an interim plan, citing the procedural requirement of a full hearing on the plan and lack of evidence in the record. The court held that the Commission acted within its discretion. In contrast, the Commission has not alleged that it lacks the evidence necessary to impose a remedy in the present case
 
 
 [54]
 As the Commission itself stressed, Columbia's take-or-pay clauses had serious consequences
 [T]he effect of these provisions under present conditions is ... harmful to Columbia's customers who stand to lose markets because of fuel switching and unfair to consumers who must bear the cost. It is discriminatory to low-cost gas producers whose production is cut back. It is potentially harmful to Columbia itself.
 Opinion No. 204, 26 F.E.R.C. at 61,120.